IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 26, 2010 Session

## STATE OF TENNESSEE v. REGINALD FOWLER

**Appeal from the Criminal Court for Knox County**
**No. 88531      Richard Baumgartner, Judge**

**No. E2009-00293-CCA-R3-CD - Filed September 29, 2010**

The Defendant, Reginald Fowler, was found guilty of aggravated arson, a Class A felony, following a bench trial in the Knox County Criminal Court. On appeal, he argues (1) that the evidence is insufficient to support his conviction, (2) that the trial court erred in failing to enforce the Rule of Sequestration in violation of Rule of Evidence 615, and (3) that the trial court erred in permitting the State to call a rebuttal witness. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Mark E. Stephens, District Public Defender, and Robert C. Edwards, Assistant Public Defender, for the appellant, Reginald Fowler.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

The facts relate to a fire at the Hamilton Inn in Knoxville. Doris Delong testified that she and her husband, Randy Delong, worked at the Hamilton Inn extended stay hotel in Knoxville. She said that the Defendant checked into room 136 on November 20, 2007. The Defendant told her he had just moved from Houston, Texas, to work for TVA. He provided a Texas driver's license, a Houston address, and a Houston telephone number. The rate was $149 per week for single occupancy, and Ms. Delong gave the Defendant one key to the room.

If the Defendant had more than one person staying in the room, she would have given him two keys and charged a higher rate. The Defendant was driving a 1994 Buick.

Ms. Delong testified that the Defendant came to the office on November 21 and accused her of giving his girlfriend a key to his room. She informed the Defendant that she could "read" his lock and determine if anyone had accessed his room. She instructed the maintenance employee, Jon Wensell, to accompany the Defendant to his room. Ms. Delong said the Defendant became frustrated but followed Mr. Wensell out of the office. She said that approximately thirty minutes later, the fire alarms went off. The alert horn sounded in each room, and lights flashed in the rooms equipped for persons with disabilities. Strobe lights also flashed in the corridors and public areas of the hotel. She and Mr. Delong searched the building because the alarm system did not indicate which room's fire alarm had been triggered. She saw water sprinklers hitting the window of room 136, and she opened the door about three inches. Ms. Delong saw a lot of smoke and the glow of flames coming from the bathroom area. She closed the door, left the sprinkler system on, and called the police. While she was on the telephone with the police, Mr. Wensell and a hotel guest were able to open the room's door about one foot by shoving the door against a dresser that was blocking it. Ms. Delong left to calm the crowd that had gathered. She said that the hotel had 114 rooms, all occupied, that it was early evening on the day before Thanksgiving, and that most of the children were "home" from school. Ms. Delong said that most rooms housed two adults and children.

Ms. Delong testified that after the fire department cleared the room, she surveyed the damage and found four places where a fire had been started: rolls of toilet paper were burned under the bathroom sink, a burned rolled-up towel was on the dresser by the door, a pile of towels and toilet paper were burned at the bottom of the bathroom door, and a pile of towels had been burned at the foot of the bed. The dresser had been pushed against the door to the outside. The fire extinguisher was missing although every room was equipped with one. When Ms. Delong began cleaning the room, she found the smoke detector wrapped in a hat and a bedspread on the floor. She recognized the hat as the one the Defendant was wearing when he was in the office. The bathroom door, the door frame, part of the tile, and part of the carpet needed to be replaced, and it took a week to clean the room. She did not see the Defendant again at the hotel. The hotel had security cameras installed around the building. Ms. Delong viewed the videotapes after the room was cleaned and saw the Defendant leave the back of the building where a small curve led to an alley and a dialysis center. When she first looked into the room, the towel bar on the dresser and the objects on the bathroom floor were on fire. She said that the bathroom exhaust fan was designed to close at a certain temperature to prevent a fire from spreading and that it was damaged. The window blinds next to the door had melted. She said the fire extinguisher was found in the laundry room.

The State played a video-recording in which the Defendant entered the hotel office wearing the baseball cap that was found wrapped around the smoke detector. He left with Mr. Wensell and walked to his room. About twenty minutes later, the Defendant left his room and drove his car from the parking lot.

On cross-examination, Ms. Delong testified that she called police dispatch because it was faster than calling 9-1-1. The fire department arrived quickly. She agreed that code regulations required each room to have a small kitchen fire extinguisher within one foot of the stove. She found the fire extinguisher for the Defendant's room in the laundry room, located next door to the Defendant's room. She agreed that a large fire extinguisher was on the wall outside the Defendant's room and that it had not been moved. She also agreed that the smoke detector in the Defendant's room was hardwired into the electrical system, that it had a battery backup, and that the battery was removed.

Ms. Delong testified that the Defendant was upset when he came to the office but that he was not waving his arms or yelling. She explained that a "key reader" was a small device that can detect when a lock was last opened and by which key card. She confirmed that she saw a glow from the bathroom area, but she could not be certain whether she saw fire anywhere else in the room because it was so smoky. The tub was covered in soot, but she did not see any water in it. The fire sprinkler was located in the bedroom but sprayed far enough to reach the bathroom walls.

Randy Delong testified that he was the property manager of the Hamilton Inn. He said that he was in the office when the fire alarm system was triggered. The system indicated that the sprinkler system was engaged somewhere in the building. He began searching and saw water hitting the windows in room 136. He said that Ms. Delong opened the door a few inches to see if anyone was inside but that there was too much smoke and that she quickly closed the door. Mr. Wensell arrived and tried to open the door but found it blocked. Mr. Delong told Mr. Wensell that he was going to turn off the sprinkler system and that Wensell should find whoever was in the room. Mr. Wensell did not find anyone, and Mr. Delong turned the sprinkler system on again. The fire department arrived and discovered that "separate little fires" were set throughout the room. Mr. Delong said he saw the different places where fires had been set. One of the globe bathroom fixtures was on the dresser, securing a towel rod that had a towel wrapped around one end. He said the globe held the rod in place in order that it would not fall off when the dresser was lifted to block the door. Other disgruntled tenants had moved the dressers in front of the doors on their way out of the rooms. He saw a pile of what looked like bedsheets on the floor. The fire extinguishers were marked with their respective room numbers, and he found the fire extinguisher for room 136 in the laundry room. Mr. Delong saw the smoke detector wrapped inside some linens and the hat that he saw the Defendant wearing earlier that day. He found singed toilet paper inside the

bathroom cabinet. He noted that on the videotape, the Defendant was seen leaving his room, walking to his car, and driving into the back alley. He said that a few minutes later, the strobe lights from the fire alarm were seen flashing.

On cross-examination, Mr. Delong testified that Mr. Wensell and a guest entered the room, looking for the occupant. He said they went as far as the back wall, but not into the bathroom, and returned. He stated that Mr. Wensell said, "The room's still on fire. Nobody's in there." From photographs of the crime scene, Mr. Delong identified smudge marks and smoke damage on the inside and outside of the bathroom cabinet. He said the cabinet doors were closed when he entered the room after the fire. He said that many people drove over the small curb at the back of hotel to gain access to the alley. He said the cost of repairs to the room was $1,239.50.

Jon Wensell testified that he worked at the Hamilton Inn on November 21, 2007. He was in the hotel office the day the Defendant checked in and on the next day, when the Defendant asked if the staff gave anyone a key to the Defendant's room. He agreed to read the Defendant's lock and followed the Defendant to the room. Once they reached the room, the Defendant said that there was no point in reading the lock and asked him not to let anyone else into the room. The room was smoky, and the Defendant remarked that he had been smoking.

Mr. Wensell testified that when the fire alarm was triggered, he received a page informing him that the location of the fire was room 136. He and one of the tenants were able to enter the room by pushing the door until the dresser moved. He was trying to determine if the Defendant was still in the room. Mr. Wensell could not see much because it was smoky and the sprinklers were running. After the fire was out and the smoke cleared, he saw torches on the dresser and on the bathroom sink. The unburned torch on the bathroom sink was made from a towel wrapped around a socket wrench. The sheets and comforter were on the floor, and they had been set on fire. Rags and a roll of toilet paper had been set on fire under the bathroom sink. He did not move the clothes or the bedding in the room, but he may have stepped on them when he first entered. Mr. Wensell knocked the television off the dresser when he first entered the room. After the fire department finished, he began removing the water from the room. He found some of the Defendant's clothing in the chair but none in the dresser. He said the telephone located in the room was capable of having 9-1-1 dialed. He said there was a fire alarm pull station and a fire extinguisher located next the Defendant's room.

Mr. Wensell testified that later that evening, he stood on the second floor balcony on the opposite side of the building and saw the Defendant drive by and pull into the Pilot gas station across the street. He ran toward the Defendant's car, but the Defendant was leaving the parking lot by the time he arrived at the station. When an off-duty sheriff's deputy pulled into the parking lot, Mr. Wensell informed him what had happened, and the deputy stopped the Defendant.

On cross-examination, Mr. Wensell testified that the Defendant seemed nervous when he came into the office on November 21 but that the Defendant did not yell or argue. He did not have an opportunity to read the lock before the Defendant told him not to worry about it. He was the first person to enter room 136 after the fire alarm went off, and the dresser was blocking the door. He said that it was not too hard for him and a tenant to push the dresser out of the way and that it only took a few seconds. Mr. Wensell could not tell if anything was still burning inside the room because of the smoke, but he saw a glow by the bathroom door. He did not find the burned objects under the bathroom sink until after the fire department left. He said that most of the damage was to the bathroom door and its frame. When cleaning up the room, he found drug paraphernalia, some Brillo torn into small pieces, and a crack pipe. He could not remember whether it was he or Mr. Delong who found the fire extinguisher in the laundry room.

On redirect examination, Mr. Wensell testified that he found the torn Brillo on the kitchen counter and under the cabinet. He found the crack pipe on the bar the next day. On re-cross examination, Mr. Wensell testified that he found the Brillo after the fire department left.

Investigator Travis Kincaid testified that he was employed with the City of Knoxville Fire and Explosion Investigation Unit. He was a former U.S. Marshal, a certified fire and explosive investigator firefighter, and a paramedic. After voir dire by the Defendant, Investigator Kincaid was accepted as an expert in fires and their origins. Investigator Kincaid said he was working the evening shift on November 21, 2007, with Captain Jeff Stooksbury. After arriving at the scene, he spoke with the incident commander and an assistant chief and received a brief report. He began his investigation outside and worked in the path of least burned to most burned. He saw protected areas in the carpet which indicated that the dresser was moved after the fire. The television was knocked off the dresser. The stove would have been a common source of accidental fire, but it was "totally clean" and the knobs were in the off position. The fire extinguisher was missing. Investigator Kinkaid said that the point of origin for the fire was at the bathroom threshold. There was heavy smoke damage. He also found charring, which occurred when heated wood released vapor, causing fissures. He said

that a photograph showed a "trailer," which was a trail of combustible material or ignitable liquid used to spread a fire faster and farther than it normally would have spread. The sheets, the Defendant's clothes, and a bag made the "trailer" which extended under the bed. He said that Captain Stooksbury found the smoke detector under a blue hat. He said that the missing fire extinguisher and the disabled smoke detector "raised a lot of red flags." The patterns of smoke staining and the smoke detector mounting tabs remaining in place indicated that the smoke detector was removed before the fire started. The bathroom fan was melted. There was no evidence that a fire extinguisher had been used or that anyone attempted to extinguish the fire. At that point in his investigation, he believed that the fires were not accidental. He explained that torches were used to set fire to objects that were difficult to light with open flames.

Investigator Kincaid testified that he found no clothes or belongings stored in the room. He retrieved the hotel records and determined that the Defendant was the person who rented the room. He watched the videotapes of the Defendant recorded by the hotel's security cameras. He issued a "be on the lookout for," or BOLO, for the Defendant. At about 10:30 p.m., he received a call that an off-duty sheriff's deputy stopped a person matching the Defendant's description. He went to the scene of the stop and confirmed that the suspect was the Defendant. When the deputy searched the Defendant's car, Investigator Kincaid saw "all kinds of clothes just thrown" into the trunk. He found it odd that the Defendant checked into an extended stay hotel and intended to go to and from work but left his clothes strewn in the trunk. He read the Defendant his Miranda rights after the Defendant was transported to the City-County Building, and the Defendant stated that they were ruining his Thanksgiving. He asked the Defendant what happened, and the Defendant replied again that they were ruining his Thanksgiving by "trying to pin this" on him. He said that the Defendant stated he had been cooking some noodles.

Investigator Kincaid testified that the fire began near the bathroom door and not at the stove. He said that a bed pillow was not the source of the fire because it was burned on top and not underneath. He said that fire travels up and out, not down, and that the protected area between two burns on the bathroom threshold indicated that two or more fires were set. He said that using his "human senses," he found no evidence of an accelerant. He did not take samples and did not use a dog trained to detect for accelerant. Investigator Kincaid said that based upon the use of the "scientific method," he recognized the problem, defined the problem, collected data, analyzed the data, formed a hypothesis, and formulated a working theory. He said that he was able to rule out all accidental causes of the fire, including the electrical system. He did not find liquor bottles, lighters, crack pipes, or other evidence that would support the theory of an accidental fire. He observed the Defendant and did not believe him to be under the influence of an intoxicant. He said that during his career, he had arrested

people for intoxication, and that the Defendant did not have an unsteady gait, bloodshot eyes, and did not slur his words. The Defendant was not tested for intoxication.

On cross-examination, Investigator Kincaid testified that he decided this was probably a criminal investigation when he realized that the fire extinguisher had been removed from the room, which he said occurred thirty to forty-five minutes after he arrived at the scene. He agreed that the 9-1-1 dispatch "run report" indicated that he arrived at Hamilton Inn at 5:57 p.m. and departed one hour and forty-three minutes later. He took photographs of the scene but did not save any evidence. He did not look in the cabinet under the bathroom sink. He said the position of the television on the floor showed him where the dresser was positioned when it had been blocking the door. He said the trailer indicated to him an intent to burn the bed. He agreed that the plastic shower curtain would have been a good source of fuel. He could not say whether it would have been more effective to have piled objects on the bed and set them on fire. He identified an object in a photograph as clothing or a gym bag. He described one of the torches as a towel bar with a pillow melted around it. He said that the cabinet under the sink was not a point of origin for the fire.

Investigator Kincaid testified that he did not know that Mr. Wensell found drug paraphernalia in the room. As part of his investigation, he examined the room for evidence of misused smoking material and found none. In forming his opinion, he relied on the witnesses' statements, the photographs from the scene, and his onsite examination. He agreed that the "scientific method" of fire investigation was taught in the National Fire Protection Association's (NFPA) manual. He said that after he conducted a data analysis, he and the other investigator formed several hypotheses for the fire: electrical fire, smoking fire, incendiary fire, appliance malfunction, and someone breaking into the room and setting it on fire. He agreed that at that point, he had proceeded through the NFPA scientific method as far as the "test the hypothesis" phase. He said that he approached the fire without presumption and that he tested the hypotheses using "cognitive theory." He acknowledged that using human senses to test for the presence of an accelerant meant that he used his sense of smell. He agreed that it was possible that pure grain alcohol did not have a smell. He agreed that the NFPA manual stated that a fire investigator should not destroy or discard evidence. He said that he did not destroy the evidence but that he preserved it through photographs. He did not save any of the burned material or the torches, and he would not agree that he should have done so because he did not believe the fire was caused by an accelerant. He would not agree that the two burned areas by the bathroom were a single fire separated by the clothing or the gym bag. He said that the torch was not a point of origin but that it was used to move the fire from one place to another.

Investigator Kincaid testified that he filed a second report in response to the Defendant's motion requesting explanation of the scientific method. In the second report, he wrote that the room contained three separate ignition points, including a point "under a bathroom sink inside the cabinet." He acknowledged that he previously agreed that the bathroom cabinet was not a point of origin, but he said that the materials inside the cabinet could have been a point of origin. He agreed that a photograph from the scene showed that the materials were not on fire when they were placed in the bathroom cabinet. He said that the small fire extinguisher from the room was "hidden" because it was not in the Defendant's room. He would not agree that the fact that the large fire extinguisher remained in its location outside the Defendant's room meant that the Defendant had not hidden the small fire extinguisher. He said that it was more likely that the large fire extinguisher was too difficult to move. He agreed that the primary purpose of the smoke detector was to alert the room's occupant of a fire and that the smoke detector did not trigger the sprinkler system, the hotel-wide alarm, or notify the fire department. He said that firefighters could disable the sprinkler head by breaking the bulb and placing a wedge in it, but he did not know how to disable the entire sprinkler system. He did not check the bottom of the Defendant's shoes.

Sheryle Ferguson Gusby testified that she had known the Defendant for more than thirty years and that he stayed at her house from April to October 2007. She said she ordered him out of her house at the end of October 2007. She called the Defendant at 4:30 or 4:45 on the Wednesday morning before Thanksgiving to wake him for work. The Defendant called her at 8:00 that evening and said that he had been drinking "a pint" and smoking a cigarette with an ashtray propped on the pillow, fell asleep, and started a fire in the hotel room. She said that the Defendant stated it was a large fire. She asked him if he extinguished the fire, but she could not remember his response. She asked him if he had informed someone at the hotel about the fire, and he replied that he had not. She told the Defendant, "You have to go make that right. There's kids there."

Ms. Gusby identified a letter that the Defendant wrote to the NAACP and left at her house. The letter stated in part:

On November the 21st of [2007], I accidentally fell asleep
with a cigarette in my hand where my pillow caught on fire and
I awakened to a small blaze, but a smoke filled room. I jumped
up, [grabbed] the pillow off the bed, along with the covers, and
tried to get them to the bathroom, because I had water in the tub,
as I was going to take a bath, I just fell asleep before I got there.
Tired from working on my car. Anyway, I dropped the pillow in

the door way, where I then had to stomp the fire out. I left because the room was [smoky], and I was going to clean it upon my return. Anyway, the motel called a fire investigator before I returned, who made the absurd conclusion that I started the fire purposely, with an open flame, match or whatever, and that's how I received this charge. At my preliminary hearing, the motel testified that the sprinklers had come on, and that's how the fire went out, except wasn't nothing damaged but a little smoke on the bathroom door. If sprinklers put the fire out, the carpet, mattresses, TV, all would be damaged.

My case is in the grand jury, and they are trying to charge me with this crime.

. . .

I am an educated man, as you see, a couple of certificates, a couple of years of college, and I know better than this, and the real issue is, I had no reason to do this. . . .

Ms. Gusby testified that she allowed the Defendant to return to her home in January 2008. The Defendant drove a burgundy-colored Ciera with a temporary "drive-out" tag. The Defendant and she occasionally drank alcohol together, and the Defendant drank gin. She had never heard of Everclear. She said that she had experience with the Defendant and knowledge of his reputation for truthfulness. She said that the Defendant was "a very sick individual . . . a master manipulator."

On cross examination, Ms. Gusby testified that she helped the Defendant make bond after his arrest. She did not believe at the time that the Defendant had purposely set the fire. She ordered the Defendant out of her house because she caught him using crack cocaine and spending money that he was not supposed to spend. She did not know that the Defendant used crack cocaine before he came to live with her. She said she did not help the Defendant post bond in an attempt to save their relationship, but rather to save the Defendant's life. She felt that "God had smacked him down, and . . . that this would turn him around, that this was his last chance." The Defendant showed her his tennis shoes and told her they were scorched on the bottom.

On redirect examination, Ms. Gusby testified that her opinion about whether the Defendant intended to burn down the hotel had changed because she found out things about him after he was arrested. She said that she saw the pictures from the crime scene and that what they depicted did not match the Defendant's story.

Captain Investigator Jeff Stooksbury of the City of Knoxville Fire, Explosive, and Investigation Unit testified that he and Travis Kincaid responded to the Hamilton Inn fire. He entered the bathroom but did not find any water in the bathtub. He said the bedding, except for the bottom sheet, was pulled off the bed. He did not see any evidence that there had been an open flame on the bed or that a person fell asleep and ignited a pillow while smoking a cigarette. He did not see any staining on the wall or headboard where a pillow would normally have been. On cross-examination, Captain Stooksbury agreed that the run report showed that he was dispatched to the Hamilton Inn at 5:56 p.m., arrived at 6:02 p.m., and left at 6:42 p.m.

The Defendant testified that he met Cheryl Gusby when he attended Bearden High School. He said he moved to Texas for about twenty-eight years. He attended two years of college and held technical degrees as a "PCA 3, certified nurse," and as an asbestos and insulation technologist. He worked as a nurse for ten years in Texas but left because the stress affected his heart. During his employment as a nurse, he became addicted to crack cocaine. He admitted to four arrests related to drug use. He was also convicted of burglary in 2002 because he was the lookout for others who attempted to steal money from a change machine at a carwash in order to buy crack cocaine.

At some point, the Defendant and Ms. Gusby renewed their friendship, and he returned to Tennessee. He had prior experience working in asbestos and insulation and obtained his re-certification in Knoxville. He started working as the asbestos and insulation technician at the TVA Plant in Sevierville.

The Defendant testified that he hid his past problems with crack cocaine from Ms. Gusby. He said he started using cocaine again after he was employed because he was making more money than he had in quite some time. After Ms. Gusby discovered his cocaine use, they "fought and fought." Ms. Gusby kept "close tabs" on the Defendant, and it became difficult for him to use cocaine at home. The Defendant decided to move out. He moved to the Hamilton Inn based on a referral from a coworker.

The Defendant testified that he checked into the Hamilton Inn on his payday, November 20, and signed a one-week lease. Most of his belongings were in the trunk of his car. He did not bother moving many things into his room because his "whole goal" of going to the hotel "was to use crack cocaine in peace." He stayed high all night and did not sleep. He said that he hid his crack pipe, which was made from a metal tire tool, in a hollow towel bar located in the bathroom. He said he used Brillo to stuff one end of the pipe to keep the cocaine inside the pipe and make it burn more slowly.

The Defendant testified that he did not go to work the next day, although Ms. Gusby called him at 5:45 a.m. to wake him for work. He pretended he was asleep and thanked her for waking him. He left the hotel because he was afraid that Ms. Gusby would come to check on him. He drove around until he found a crack cocaine dealer, and he bought another $50 worth of cocaine. He went back to the hotel and smoked it. He continued his binge that night and into the next day. He said he did not call his employer because the day before Thanksgiving was an "optional" workday. He bought another $100 worth of cocaine at 3:00 or 4:00 p.m. He also bought pure grain alcohol to use in smoking it. After he returned to the room, some of his clothes that had been on the chair were then on the floor. He thought that Ms. Gusby had been in his room, and he went straight to the office. He said that he saw the video recording of his coming into the office. He was nervous, and the crack cocaine also made him jittery. He was not angry because "[i]f you got a hundred dollars worth of crack in your pocket, and money, and somewhere to go with no one to bother you, ain't nothing in the world can make you angry." The Defendant said that after Mr. Wensell showed him the card reader, he understood that Ms. Gusby had not been in his room. He also said that he asked Wensell to accompany him to his room because he was afraid that someone was hiding in it. When the door opened, Wensell said, "Whoa, I smell smoke." The Defendant realized from Wensell's reaction that Wensell had recognized the smell of crack cocaine smoke, and he testified this was the reason he told Wensell not to worry about using the card reader. As soon as Wensell left, the Defendant slid his dresser against the door because he was afraid that someone would come into his room.

The Defendant testified that he ran a bath, took off his shirt, and placed it on the sink. He went to his bed and put a prescription bottle containing pure grain alcohol on the table next to the bed. He said he used the prescription bottle to hold the alcohol because that way he would not have an open bottle of alcohol in his car. In addition, the prescription bottle was easier to carry. He lay back and placed a pillow under his left arm, which was nearest the table. The Defendant used forceps to hold a cotton ball, dipped the cotton ball into the alcohol, and lit it. He used pure grain alcohol instead of a butane lighter because the butane made him "cough up all of this black stuff." He melted the crack cocaine with the lit cotton ball. He said that he blew on the cotton ball to extinguish the flame but that he was paying

-11-

attention to the crack pipe and not to the fire.  He said he dipped the cotton ball back into the container of alcohol, not realizing that it was still hot enough to flare up.  He said that the container of alcohol "blew up . . . it caught on fire."  The Defendant said the cotton ball caught on the edge of the bottle as he pulled the forceps toward him.  The flaming alcohol "rolled down the forceps" toward the Defendant's hand, and he dropped it.  He stated that the bottle of alcohol spilled onto the pillow and that the pillow caught fire.  He said he flung the bed covers into the floor because he did not want them to also catch fire.  He grabbed the pillow and ran to the bathroom because he had a tub full of water.  He said that he made it to the corner of the bathroom door before the pillow became too hot for him to hold and that he dropped it.  He said the flame burned about eighteen inches high at that point.

The Defendant testified that he grabbed the t-shirt that he left on the bathroom sink and tried to fan at the flames to put out the fire.  He realized the shirt was going to catch on fire, so he threw it back onto the sink.  He looked for something to use to pick up the burning pillow and grabbed the towel bar that he had used to conceal his crack pipe, which was lying on the bathroom counter.  The Defendant also had a black case containing his tools with him in the room, and he grabbed a socket wrench to use with the towel bar.  He said that they went "straight through" the pillow.  When he tried to pick up the pillow, it fell in pieces to the floor.  He identified a picture of the towel bar where the pillow had melted onto its end.  The Defendant said there were burn marks on the floor where the pillow landed.  He was still wearing sneakers and stomped on the fire.  He said the fire "went down" and he picked up the pillow.  He said that he turned and saw the fire extinguisher but that he had been too high to have noticed it before.  He said he dropped the pillow beneath the fire extinguisher, pulled the fire extinguisher from the wall, but realized the pillow was no longer burning.  He thought the fire was out and did not spray the extinguisher.  The Defendant said that the smoke detector was beeping and that he took it down because he was afraid that someone would come to the room.  He said he left it beeping next to the pillow.  He thought he needed to leave because he had "dope everywhere."  He said he grabbed his drugs and started toward the door but realized that the dresser was in the way.  He moved the dresser enough to get out of the room and took about five steps toward the office.  He was still carrying the fire extinguisher.  He said that he remembered having crack cocaine in his pocket and that he was afraid the hotel staff would call law enforcement.  He was afraid to open the door to his room again because the smoke would "whoosh out," and he placed the fire extinguisher in the laundry room next to his room, went to his car, and left.

The Defendant testified that he planned to drive around until the smoke cleared from his room and then return to clean it.  He called Ms. Gusby and asked for her help in cleaning the room, telling her he had caused the fire when he was smoking a cigarette, not crack cocaine, and she refused.  He said he drove around for a while and smoked crack.  He said he

began driving toward the hotel but realized before he arrived that he would want to smoke crack after cleaning the room and would not want to leave the room again. He decided he would purchase more cocaine first. He pulled into the Pilot station to purchase gasoline. He went inside to pay and when he came back outside, the police were sitting "across" from him. After he left the parking lot, he was stopped and arrested.

The Defendant testified that Investigator Kincaid was there and that he told Kincaid, "You have ruined my Thanksgiving, you're going to have me eating noodles." He said he was referring to "the facility out there . . . where noodles is the main meal . . . ." He denied that he told Kincaid that he started the fire while making noodles because he had no pans or food in his room. He said he did not walk away from Kincaid because he would not have been allowed to walk away from the police. He knew there were people in the hotel. He said he would "definitely not" have set fire to the hotel on purpose because he had been a nurse and would never hurt anyone. He was not angry with anyone because he had everything he needed at the hotel. He was not frustrated about being at the hotel instead of at Ms. Gusby's house because he had a bed, a refrigerator, a stove, ESPN, and crack cocaine. He said that when he left the room, the fire was no longer burning because he stomped it out. He said that the bathroom door was singed or charred.

On cross-examination, the Defendant testified that he was an educated man who knew that alcohol could start a fire. He said he purchased pure grain alcohol because he was looking for something that would burn. He agreed that the higher the proof of the alcohol, the more likely it was to burn, and he wanted the highest proof available. He said that he had heard of Everclear brand of pure grain alcohol. He had not noticed the labels on the Everclear bottle that read, "Caution: Extremely Flammable." He said he needed it to make a fire. He was not surprised that another warning label read, "Caution: Do not apply to open flame. Keep away from fire, heat and open flame. Contents may ignite or explode." He said he wanted the pure grain alcohol for that purpose. He said that he bought a half pint or a pint. He poured some into the prescription bottle, mixed some with Mountain Dew, and threw the rest away. The Defendant said that after spilling the prescription bottle of lit alcohol, he had to use a lighter to smoke crack while he drove around in his car. He was not worried at that point about using a butane lighter because he had fought a fire, he was nervous and shaky, and he was just trying to get high.

The Defendant testified that when he returned to his room at 4:45 or 5:00 p.m., before the fire, he did not notice that the room appeared smoky. He said he only focused on his belongings. He agreed that although there was a telephone in the room, he did not call Ms.

Gusby and ask her if she had been in his room. He said that he looked in the bathroom and under his bed before he told Mr. Wensell to leave.

The Defendant testified that after the pillow ignited, he took about five steps before he dropped it. He said that he was holding the pillow in front of him when he dropped it at the bathroom door and that he reached over the flames to grab his t-shirt off the sink. He said that fanning the fire did not extinguish it. He could not say whether the shirt was burned. He stated he did not think to turn on the water in the bathroom sink and throw some on the pillow, although he agreed that he was taking the pillow to the bathroom to put it in the bathtub. He said that he was not thinking clearly because he was high on crack cocaine. He said his toolbox was on the counter next to the bed. He agreed that he had enough time to think about his toolbox and to look for a socket wrench but that he did not think about getting water from the sink or bathtub. He did not grab the fire extinguisher because he did not see it until after the fire was out. He said the fire's height decreased before he stomped on it. He could not remember what he did with the towel bar and the socket wrench after he used them in an attempt to move the pillow. He agreed that he had "enough wits" to take his forceps and crack pipe after the fire was out. He said that the prescription bottle of pure grain alcohol had been flattened and that he flushed it and the cotton ball in the toilet. After the Defendant saw the fire extinguisher, he held it and stood by the pillow for a while. The pillow was smoldering, and he was not sure whether it was going to start burning again. He was so stunned by what happened that he could not say what made him carry the fire extinguisher outside. He did not put the fire extinguisher down to move the dresser but pushed the dresser out of the way with his hip. He did not know how the towel rack ended up on the dresser. He agreed a globe fixture from the bathroom was on the dresser, but he said he did not put it there.

The Defendant testified that he left to avoid being found at the hotel with crack cocaine, not to get cleaning supplies. He stated that because he was an addict when he wrote the letter to the NAACP, he could not remember whether he stated in it that he left to get cleaning supplies. He agreed that he lied to Ms. Gusby and in the letter. He said that he lied to Ms. Gusby "one hundred times." He would not agree that he lied when it benefitted him but admitted that he lied when it had to do with crack cocaine. He said that the fire was only on the pillow and that he did not set fire to the items under the sink. He did not try to extinguish the fire with a roll of toilet paper, but the toilet paper happened to be close to the fire and was damaged. He said that if he were going to burn something, he would not try to start the fire with a roll of toilet paper. He would not agree that a towel was wrapped around the roll of toilet paper but said that it was his t-shirt. When asked if a glass crack pipe was on the counter or the bed, he replied that he had about three crack pipes in case one overheated.

-14-

He could not say whether other people were at the hotel because he did not see any guests when he checked in.

On redirect examination, the Defendant identified the shoes he wore on the night of the fire. He said that he put the t-shirt and roll of toilet paper in the bathroom cabinet because he was leaving and did not want anyone to come in and see them, which he agreed was silly. He did not know whether the bathtub stopper worked well enough to hold water. When he left the room, he did not pull the dresser back to block firefighters from getting into the room.

Stuart W. Bayne testified that he was certified by the National Association of Fire Investigators as a Fire Explosion Investigator, as a Fire Investigation Instructor, and as a Vehicle Fire Investigator. Mr. Bayne was accepted as an expert in fire origin. He said that he reviewed the photographs from the scene, the law enforcement and fire department reports, and the interviews. He examined the Defendant's tennis shoes. He interviewed Mr. Wensell, the Defendant, Mr. Davis, who was the previous manager of the Hamilton Inn, and Mr. Martin, who was the current occupant of Room 136 at the Hamilton Inn. He defined the scientific method that he used as "the recognition and formulation of a problem[.]" He said that considering and testing a number of hypotheses was essential. He said that he employed the scientific method in his analysis of this case and that he created field tests to replicate the circumstances described by the Defendant. He said a defendant's statements were often "spun" and were sometimes "flat wrong." He said that he attempted to verify or reject, in whole or in part, a witness's statements. He said that although he did not see the scene of the fire, he had enough demonstrative and documentary evidence to arrive at an opinion of the cause of the fire.

Mr. Bayne testified that the photographs indicated a single set of burn patterns but showed no evidence of application of fire to any of the primary "fuel packages" in the room, such as the bed, the dresser, or the chairs. He also conducted field tests in an attempt to duplicate what he saw in the photographs. The Defendant had said that he attempted to pick up the burning pillow with two makeshift tools and that the pillow fell through the tools. Mr. Bayne learned the composition of the hotel pillows from Mr. Davis, the hotel manager, and purchased pillows of the same composition. He conducted field tests in an enclosure designed to reduce airflow and to create some semblance of an uninterrupted air pattern on a floor level. He purchased a pair of tennis shoes and stomped on a burning pillow. He studied pure grain alcohol's combustion characteristics and determined that it burned very cleanly. He said that it was almost impossible to see the flame from pure grain alcohol inside a container. Mr. Bayne was surprised several times during his tests because he believed that he had

extinguished the cotton ball, but it reignited when he dipped it into the container of pure grain alcohol. The container of alcohol was on fire, but the flame was nearly invisible. He burned pillows both with and without pure grain alcohol, and he attempted to duplicate the burn patterns on a linoleum floor. He also attempted to pick up the pillows with plastic and metal makeshift tools. The pillow fabric was made of polyester and cotton, and the filling was one hundred percent polyester, which was "essentially plasticized fabric." He said that the burning pillows fell apart, dripped, and wrapped around the tools like cotton candy. He said that portions of the pillow congealed around the plastic tool and that the plastic tool began to melt as well. He said that the Defendant's account of what occurred in the fire was "quite consistent" with the field tests that he conducted.

Mr. Bayne testified that no fire occurred in the bathroom cabinet because there was no evidence of heat stains except on the material. He agreed that the items were tossed into the cabinet after they had been burned. He said that the metal pole with the melted material on it and the bathroom cabinet were not points of origin. He said that the photographs depicted a space between the doorway and the bathroom that might have been a point of origin but that after talking with witnesses, he believed that the point of origin was the interaction of the burning pure grain alcohol and the pillow. Mr. Bayne also said that it was possible that the fire began on the bed because a heat stain appeared to be on the end of the bed, which validated the Defendant's statements to him. When asked whether there were any inconsistencies between his findings and the Defendant's statements, he said that he did not "trust what [the Defendant] stated to me about exactly how the pure grain alcohol landed on the pillow . . . I cannot duplicate that in a field test. And it's not shown in the photographs." He disagreed with another witness's testimony that the fire could not have started on the bed. He said the photographs showed that the box springs were covered in plastic and that the plastic on the side of the box springs closest to the center of the room had shrunk and shriveled. He said that plastic shrinks and shrivels when it is exposed to a heat source. He said that the material strewn on the floor was inconsistent with a trailer. He questioned whether the Defendant or the fire department had moved the material. He did not see a burn pattern on the material or a consistent pattern from the linoleum floor to the edge of the bed.

Mr. Bayne testified that he duplicated the Defendant's stomping on a burning pillow, using similar tennis shoes. He wore the shoes for several hours after the field test in order to replicate the Defendant's actions on the day of the fire. He then compared the shoes that he tested with the Defendant's and determined that they had the same kind of melted or burned polyester and plasticized fabric on the sides and bottoms. He said that because both of the Defendant's shoes had scorch marks on them, the Defendant stepped on the fire with both feet, accidentally or intentionally. He said that if only one shoe had had scorch marks, it could mean that the Defendant had tried to step over the fire. He said that in following the NFPA

921, a "guidance document," he considered and rejected many other hypotheses. He rejected completely the hypothesis that the Defendant attempted to burn down the hotel using a pillow. There was no evidence of burn patterns or fires having been set on any of the fuel packages of the room. He said that if the Defendant had really wanted to burn down the hotel, he likely would have tried to use the fuels that were available in the room. He also based his opinion on the field tests that duplicated the results of the fire.

Mr. Bayne testified that the pillow burned at a sufficient temperature to trigger the sprinklers. He said that there was not an inconsistency between the Defendant's testimony that the fire was out when the Defendant left the room and the hotel personnel's testimony that the fire was still burning when they opened the door to the hotel room. He said that pillow fires were "stubborn" and could continue "cooking" if they were not hit directly by water spray. He said that his experiments burning the linoleum with the pillow were consistent with the photographs from the fire. He spent between forty-seven and fifty hours working on the case. Mr. Bayne said that he was very comfortable with his opinion that the fire was an accident and "an unintentional consequence of an idiot doing something he shouldn't have been doing." He said that he would not have been comfortable reaching the conclusion that a criminal act occurred if he had spent only thirty minutes at the scene.

On cross-examination, Mr. Bayne testified that the Defendant was the only person he interviewed with personal knowledge about the fire. He read a transcript of an interview with Jon Wensell that he received from defense counsel. He did not review the tape from the preliminary hearing or the 9-1-1 tape. He did not watch the video-recording of the Defendant at the hotel because he said it had nothing to do with the damage from the fire. He did not speak to Ms. or Mr. Delong. He believed that Mr. Wensell was the first person besides the Defendant to look into the room. He was unaware that Ms. Delong had opened the door and looked into the room before Mr. Wensell entered and that she testified she saw four fires. He did not know that Ms. Delong said she saw a light fixture on top of the torch on the dresser. He was not aware of the Defendant's reputation for truthfulness when he interviewed the Defendant or that the Defendant recounted three versions of how the fire started. He said that just because the Defendant was a liar did not make the Defendant an arsonist.

Mr. Bayne testified that the fire consumed the bed pillows, portions of at least one bed sheet, blanket, or bed cover, a portion of the lineleum floor located between the open bathroom doorway, the bathroom door, and the door trim. There was also a small amount of heat damage to the plastic wrap covering the bed's box spring. He had not seen the photographs that showed the burned smoke detector and the burned blue baseball cap. He saw evidence of convective heat transfer on the bathroom doorway and evidence of charring on

the lineleum floor, the door, and the door trim. He identified "alligatoring" on the door frame, which suggested that the fire accelerated and that the exposed wood surfaces cracked, heated, and raised. He denied that alligatoring had any significance in this fire because the entire set of burn patterns comprised only a small fire emanating from one place.

Mr. Bayne testified that he conducted field tests by constructing an enclosure. The enclosure did not have a roof. He conducted six field tests on the pillows, burning four pillows inside the enclosure and two outside the enclosure. The pillows took between 300 to 400 seconds to burn. He did not take photographs of the bottle of burning pure grain alcohol but said that the flames were almost invisible except for a small blue tint. He did not subject his field tests to peer review. He said that peer review was important in complex evaluations and field tests. He considered Dave Icove to be an expert in arson and arson investigation. He had recently taken a class from Mr. Icove but had not discussed the case with him. Mr. Bayne would not agree that the Defendant's statements were hypotheses, but he agreed that the purpose of testing was to affirm or reject the hypotheses associated with the Defendant's statements. He wrote in his report that the Defendant was intoxicated, which he based upon the Defendant's statements to him. He said the Defendant's condition had no bearing on the damage to the room, but he agreed he wrote that his report attributed the fire to the Defendant's uncoordinated acts. He would not agree that the Defendant's ability to drive a car had any influence on whether the Defendant's acts were uncoordinated.

On redirect examination, Mr. Bayne testified that he examined two statements from Mr. Wensell, one made on July 7 and the other made on October 24, 2007. He reviewed the Knoxville Police Department Crime Report and the Knoxville Fire Department Incident Report. He was furnished a copy of Investigator Kincaid's rebuttal to his report, but he had been unable to obtain a statement from Investigator Kincaid. He said Investigator Kincaid's rebuttal report did not include a statement of the origin and cause of the fire. He went to the Hamilton Inn and was informed that the Delongs no longer worked there. He tried for several weeks to arrange interviews with the firefighters through the city law department.

Mr. Bayne testified that the alleged trailer might have been unintentional or intentional but that no fire pattern or indication of movement of fire was on the trailer. He said the question remained whether the materials comprising the alleged trailer were found in that location or were moved by Mr. Wensell or the firefighters. He did not see anything in the photographs of the scene that were inconsistent with his findings. He did not see evidence of more than a single set of burn patterns in the linoleum floor. He said that if there had been four fires, there would have been four burn patterns. No evidence of burn patterns was inside the bathroom cabinet, and no evidence of a burn pattern associated with the torch was on the

dresser. He said the videotape showed that the sprinkler system was activated three minutes after the Defendant left the hotel room. The trial court stated that the photograph depicted two distinct burn areas on the floor on the either side of the door jamb and that an unburned space was between them. In response, Mr. Bayne said that it could have been caused by one pillow with fabric against the floor that did not burn, by one pillow with both ends burning toward the middle, or by bedding in between burning pillows. The trial court stated that the wooden bathroom door appeared to have been exposed to flame for some time. Mr. Bayne replied that the bathroom door was a hollow core door and would not have lasted more than six minutes in any fire. He said that the door trim showed a baked appearance, not alligatoring, and the wood had expanded and cracked as the moisture was drawn out of the wood.

Mr. Bayne testified that an object could have shielded the area of the unburned floor between the two burned areas and caused one fire to look like two fires. He agreed that a photograph of the scene showed the Defendant's black bag, a burned object, and burned material.

In rebuttal, David Icove testified that he was a reserve deputy sheriff assigned to the Knox County Fire Investigations Unit. He authored Forensic Fire Scene Reconstruction and served on the advisory panel for NFPA 921, a standard of care for fire investigation. He discussed the case with Investigator Kincaid and Captain Stooksbury and spent several days reviewing the investigation reports and associated documents, the photographs, and Mr. Baynes's report. He was not paid for the time he spent working on the case. He said that the picture of the damage to the doorframe indicated that a fire burned directly below it. He was not able to determine how long the fire burned, but he estimated that the size of the fire was consistent with a trash can fire that had burned at about 100 watts. He said that without the sprinkler system, the fire could have been very disastrous. From photographs of the scene, he identified a trailer that connected from the bedroom to the kitchen and the bathroom.

Mr. Icove testified that Mr. Baynes's tests were correctly performed field tests, not fire tests. He said Mr. Bayne did not use thermocouples to measure temperature or a smoke detector. He said that the cubicle Bayne constructed in order to conduct field tests had only a floor and walls but not a roof and that it was important to attempt to recreate the scene. It was also important to have peer review to avoid expectation bias. He said that Bayne suggested other hypotheses or causes for the fire, but Bayne did not explore them in depth the way that Investigator Kincaid had. He stated that when an investigator discounts hypotheses without testing them, he falls short of the guidelines and standards in NFPA 921. He said that he was not asked to form an opinion about the origin of the fire.

-19-

On cross-examination, Mr. Icove testified that he reviewed Investigator Kincaid's reports. He said that both reports showed that Investigator Kincaid considered and properly tested various hypotheses. He said that, for example, Investigator Kincaid used the scientific method and reported evidence that the fire alarm and extinguishers were tampered with and that the door was blocked. When asked if the information in Investigator Kincaid's report came from observations and not scientific tests, Icove replied that Investigator Kincaid's observations were based on prior information and training and on facts that were reported to Investigator Kincaid during the investigation. When asked to identify where Investigator Kincaid's report stated that Kincaid had considered other hypotheses for the cause and origin of the fire, Mr. Icove referred to Investigator Kincaid's second report. He did not know when the second report was prepared, and he disagreed that the second report should have been prepared near the time of the first report in order to be valid. He said that a report was valid if it was prepared "before court." He was not troubled that Kincaid's second report was prepared in rebuttal to the defense expert's report. He could not identify additional hypotheses that were considered and rejected based on the scientific method in Kincaid's first report. Mr. Icove said that Kincaid's second report discussed the hypotheses of electrical failures, ignitable liquids, accidental fire, and other behavioral actions. He agreed that the application of the scientific method needed to be deliberate and that an investigator needed to refrain from jumping to conclusions. He said that it was possible to reach a conclusion about a fire within thirty minutes of arriving at a fire scene. He could not say whether Mr. Bayne's conclusion was stronger based on the amount of time that Bayne spent conducting field tests. He said that cost was sometimes a factor in conducting field tests. He said it would be better to rely on another person's tests, calculations, or evaluations if money were not available to reconstruct a scene.

The trial court found that the Defendant was not a credible witness and found the Defendant guilty of aggravated arson. The trial court sentenced the Defendant to twenty years in the Department of Correction.

## I

The Defendant contends that the evidence is insufficient to support his conviction. The State contends that the evidence was sufficient to support the Defendant's conviction for aggravated arson. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the trier of fact resolved all conflicts in the testimony and

drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). However, when a trial court bases its findings of fact on evidence that does not involve an issue of credibility, such as a videotape, this court may review that evidence de novo. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000).

As pertinent to this appeal,

> (a) A person commits aggravated arson who commits arson as defined in [Code section] § 39-14-301 . . . :
>
> > (1) When one (1) or more persons are present therein; . . . .

T.C.A. § 39-14-302(a)(1) (2006). A person commits arson

> who knowingly damages any structure by means of a fire or explosion:
>
> > (1) Without the consent of all persons who have a possessory, proprietary or security interest therein;
> > . . . .

Id. § 39-14-301(a)(1). A person acts knowingly with respect to the result of his aggravated arson when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20). Aggravated arson is a Class A felony with a sentencing range of fifteen to sixty years. Id. §§ 39-14-302(b), 40-35-112.

In his brief, the Defendant argues that the evidence supports a determination that he set the fire intentionally or recklessly, but not knowingly. We conclude that the evidence is sufficient to support the Defendant's conviction. Taken in the light most favorable to the State, Investigator Kincaid testified that there was more than one place which showed evidence of burning. The bedding on the floor was burned, a burned torch was on the dresser, a pile of burned bedding or a burned pillow was next to the bathroom door, and an unburned torch was found in the bathroom. In addition, the room's smoke detector was disabled and the room's fire extinguisher was removed, showing that the Defendant was aware of the result of his actions. Ms. Delong testified that she saw four areas that were burned and that the dresser was moved in front of the door, blocking entry into the room. She saw burned toilet paper under the bathroom sink, a burned towel rolled around a curtain rod, and a pile of burned linens at the foot of the bed. Randy Delong testified that he saw "separate little fires

-21-

set throughout the room." He saw singed toilet paper inside the bathroom cabinet. Jon Wensell testified that he saw torches on the dresser and the sink and burned bedding on the floor. Although the defense expert testified that he believed the fire was accidentally set, the State's expert and the rebuttal expert testified that the fires were consistent with arson. The building was a hotel which was at maximum occupancy because of the Thanksgiving holiday. The Defendant told Ms. Gusby that he set a pillow on fire while smoking a cigarette. He told the police the same story. At the trial, the Defendant admitted that he set the fire, but he claimed that he set it accidentally while smoking crack cocaine. The trial court found that the Defendant was not credible. We conclude that a rational trier of fact could have found the elements of aggravated arson beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's conviction for aggravated arson.

## II

The Defendant contends that the trial court erred in failing to exclude Investigator Travis Kincaid from the courtroom pursuant to the Rule of Sequestration, Tennessee Rule of Evidence 615. The State contends that the trial court properly exempted Investigator Kincaid from the Rule of Sequestration because he was designated the prosecuting witness and his presence was essential to the State's prosecution of the case. We agree with the State.

Rule 615 of our Rules of Evidence provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial . . . . The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause . . . .

The Advisory Commission Comments to this section note that, for example, subsection (3) allows an expert witness to remain in the courtroom to assist counsel in understanding opposing testimony or to learn relevant facts available only through hearing testimony. Tenn. R. Evid. 615, Advisory Comm'n Cmts. An expert witness may need to hear the substance of other witnesses' testimony in order to formulate an opinion or to respond to another expert witness. See Tenn. R. Evid. 703.

In addition, the State's designated representative is allowed to remain in the courtroom pursuant to subsection (2). Id.; see State v. Stephens, 264 S.W.3d 719, 738-39 (Tenn. Crim. App. 2007). The State's designated representative may be the victim of a crime, the family member of a victim of a crime, or an investigating officer. Tenn. R. Evid. 615, Advisory Comm'n Cmts. A designated representative or prosecuting witness, however, is required to testify before other witnesses. See Stephens, 264 S.W.3d at 738-39; State v. Smartt, 80 S.W. 586, 588 (Tenn. 1904); Mothershed v. State, 578 S.W.2d 96, 100-01 (Tenn. Crim. App. 1978). Unlike expert witnesses, whose exception from sequestration is a matter of judicial discretion, the exception from sequestration of the State's designated representative is a matter of right. Tenn. R. Evid. 615, Advisory Comm'n Cmts; Stephens, 264 S.W.3d at 738. When a State's designated representative does not testify first, the Defendant is entitled to relief only if the Defendant can show prejudice as a result. Stephens, 264 S.W.3d at 739. In order to show prejudice, a Defendant must show that a witness improperly changed his testimony after hearing other witnesses testify. See State v. Sexton, 724 S.W.2d 371, 374 (Tenn. Crim. App. 1986) (holding that absent proof that detective changed testimony after hearing other witnesses, failure to testify first did not affect the results). In contrast, an expert witness who remains in the courtroom may generally testify after hearing other witnesses' testimony. See Tenn. R. Evid. 703; State v. Bane, 57 S.W.3d 411, 423 (Tenn. 2001).

In this case, Investigator Kincaid was not only the State's designated representative, but he was also the State's expert witness. Investigator Kincaid was properly allowed to remain in the courtroom pursuant to the sequestration exceptions embodied within Rule of Evidence 615. As an expert witness, Investigator Kincaid was permitted to testify after hearing other witnesses' testimony. Moreover, the Defendant has failed to show how he was prejudiced as a result of Investigator Kincaid testifying after Ms. Delong, Mr. Delong, and Mr. Wensell. As an expert witness, Investigator Kincaid's testimony was based in part upon his reports, which were filed before the trial. Although the Defendant claims that Investigator Kincaid testified to more information than was contained in his report, Investigator Kincaid personally investigated the scene of the crime and related the details of his observations. Nothing in the record suggests that Investigator Kincaid changed his testimony after hearing other witnesses. As a result, the Defendant has failed to show prejudice, and he is not entitled to relief on this issue.

**III**

The Defendant contends that the trial court erred in permitting the State to call Dave Icove as a rebuttal witness. He asserts that he did not receive a copy of Icove's report or notice that Icove would testify. He also claims that Icove gave improper rebuttal testimony by testifying about the quality of Investigator Kincaid's work, about the size of the fire, about Mr. Bayne's field tests, and about his own conclusions about the fire. The State contends that

the trial court properly allowed the State to call a second expert to rebut the Defendant's expert. We agree with the State.

The State first contends that the Defendant has waived this issue for failing to object contemporaneously and by assenting to the trial court's curative measures. See T.R.A.P. 36(a). The record reflects that the Defendant objected to the nature of the rebuttal testimony at least three times and that defense counsel engaged in several discussions with the trial court and the prosecutor regarding the propriety of Mr. Icove's rebuttal testimony. The Defendant has not waived this issue on appeal.

The admissibility of rebuttal evidence lies in the trial court's discretion and will not be overturned on appeal unless there has been a clear abuse of discretion. State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002). Rebuttal evidence includes "any competent evidence which explains or is in direct reply to, or a contradiction of, material evidence introduced by the accused." Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979). Rebuttal evidence must be relevant and material to the facts at issue. State v. Lunati, 665 S.W.2d 739, 747 (Tenn. Crim. App. 1983). A Defendant's discovery request for names of the State's witnesses does not include rebuttal witnesses. See State v. Teel, 793 S.W.2d 236, 246 (Tenn. 1990), superseded by statute as stated in State v. Reid, 91 S.W.3d 247 (Tenn. 2002). The State's duty to disclose the names of witnesses is directory, not mandatory. Dellinger, 79 S.W.3d at 489.

We note that the State was not required to disclose Mr. Icove's name as a rebuttal witness. The record reflects that Mr. Icove did not prepare a report.

The Defendant's expert, Stuart Bayne, testified about the field tests he created and used to conclude that the Defendant accidentally set the fire. He criticized the techniques employed by the State's expert, Investigator Kincaid. Mr. Bayne relied upon the NFPA 921 and considered Dave Icove to be an expert in arson investigation.

Mr. Icove's testimony was used to contradict evidence introduced by the Defendant and was proper rebuttal testimony. Icove testified that he reviewed both experts' reports and also spoke with Investigator Kincaid and Captain Stooksbury. Mr. Icove said that Mr. Bayne used an improper scientific method. He said, however, that Kincaid's method was scientifically proper and that Kincaid developed and rejected multiple hypotheses. The record reflects that Icove's testimony did not exceed the information contained in the experts' reports and the photographs he was shown during the trial. Icove also testified to the size of the fire and the evidence of a "trailer" based upon the reports and the photographs. His expert observations were used to contradict Bayne's expert observations. Icove criticized the manner of Bayne's field tests, upon which Bayne based his ultimate conclusion that the fire was

accidentally set.  Finally, on cross-examination, the following exchange occurred between defense counsel and Mr. Icove:

[Defense Counsel]: So if an opinion was formed by [which]ever expert within 30 minutes, it's not automatically presumptive?

[Mr. Icove]: Are you asking me what I would have done?

[Defense Counsel]: Yes, sir.

[Mr. Icove]: Given the facts and circumstances, what I read in both reports, what I saw in the fire scene photographs, as well as the witness statements and the totality of the circumstances –

[Defense Counsel]: I'm worried about your answer now, because I'm not sure you're answering my question –

[Mr. Icove]: I would have arrived at the same conclusion that Investigator Kincaid did, which was –

[Defense Counsel:] – that's not my question.

[Mr. Icove]: That's what you asked me.

Mr. Icove's testimony was proper rebuttal, and it was the Defendant on cross-examination who expanded the scope of Icove's testimony to include a conclusion.  The trial court did not abuse its discretion in allowing Icove's rebuttal testimony.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE

-25-